# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE BENJ. FRANKLIN SHAREHOLDERS LITIGATION FUND, BY ITS SOLE TRUSTEE, DON S. WILLNER,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR THE BENJ. FRANKLIN FS&LA, PORTLAND, OREGON<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Case No. 06-01025 (EGS)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FDIC-RECEIVER'S EXHIBITS
## TO ACCOMPANY ITS REPLY TO PLAINTIFF'S OPPOSITION

Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

Date:   February 9, 2007

# INDEX TO FDIC-RECEIVER'S EXHIBITS (REPLY)

**Document**                                                                    **Ex. No.**

Benj. Franklin Proven Claim Analysis By Priority Code (As of 12-31-05) .................. 6

*Managing the Crisis* Table 1.4-3 (Conservatorships 1989-1995). ............................... 7

*Managing the Crisis* p. 61 (Closing the Institution). ....................................................... 8

Proven Claim Analysis By Priority Code
As of 12-31-05

Fin 7166         Benjamin Franklin Federal Savings
Closed 09-07-90  Non-Depositor Preference

| Priority Code | # of Claims | Claim Total | Dividends Paid | Unpaid Total | |
|---|---|---|---|---|---|
| 904 | 1 | 2,650,247,965.70 | 2,650,242,167.56 | 5,798.14 | FDIC - insured deposits |
| 940 | 1 | 90,000.00 | 90,000.00 | | GTC - Others |
| 941 | 1 | 11,271.40 | 11,271.40 | 0.00 | FDIC - assigned GTC |
| Totals | 3 | 2,650,349,237.10 | 2,650,343,438.96 | 5,798.14 | |

FIN           Benjamin Franklin Federal Savings
Pass-Through  NONE

| Priority Code | # of Claims | Claim Total | Dividends Paid | Unpaid Total |
|---|---|---|---|---|
| | NONE | | | |
| Total | 0 | 0.00 | 0.00 | 0.00 |

| Recap: | Claim Total | % of total claims | Dividends Paid | % of divds paid |
|---|---|---|---|---|
| FDIC | 2,650,259,237.10 | 99.997% | 2,650,253,438.96 | 99.997% |
| GTC-Other | 90,000.00 | 0.003% | 90,000.00 | 0.003% |
| Total | 2,650,349,237.10 | 100.000% | 2,650,343,438.96 | 100.000% |

FDIC Ex. 6

Table I.4-3

## Conservatorship Institutions 1989–1995

| | Conservatorships Established | Average Number of Days until Resolved | Conservatorships Resolved |
|---|---|---|---|
| Pre-FIRREA 1989 (2/7-8/8) | 262 | 454 | 0 |
| Post-FIRREA 1989 (8/9-12/31) | 56 | 356 | 37 |
| 1990 | 207 | 323 | 309 |
| 1991 | 123 | 429 | 211 |
| 1992 | 50 | 596 | 60 |
| 1993 | 8 | 350 | 26 |
| 1994 | 0 | — | 62 |
| 1995 | 0 | — | 1 |
| **Totals** | **706** | **412** | **706** |

Source: RTC, 1995 Annual Report

Initially, the RTC had so many S&Ls in conservatorship, it had to set priorities in its resolution schedule. It decided to handle the most unmarketable S&Ls first. If an institution were suffering large operating losses, it was scheduled early in the resolution calendar. If an institution's losses were small, it was left in conservatorship and scheduled for later resolution.[17]

The case priority process was significant because it acknowledged the RTC's limitations regarding the large number of insolvent thrifts in conservatorship and the limited financial resources available. It enabled the RTC to select for resolution those institutions that presented the best opportunity for minimizing costs to the RTC or those that had a higher rate of deterioration because of operating losses, eroding core deposit bases, and loss of key personnel. The priority process also considered the amount of funding available to cover the losses and the estimated cost of resolving each institution.

---

17. "Strategic Plan for the Resolution Trust Corporation" (report), (Washington, D.C.: RTC Oversight Board, 1989).

FDIC Ex. 7

In most cases, the FDIC will receive at least one bid that is less costly than the estimated cost of liquidation.[10] If the bid includes assumption of all deposits, including uninsured deposits, the premium paid must be at least as large as the losses that would have been incurred by customers with uninsured deposits in a payoff in order for the bid to be considered less costly.

*FDIC Board Approval*

The FDIC staff submits a written recommendation to the FDIC Board of Directors requesting approval of the resolution transaction. The recommendation includes a copy of the least cost analysis and information about the share of the estimated loss that should be absorbed by customers with uninsured deposits. It also addresses whether an advance dividend should be paid to customers with uninsured deposits so they can receive a portion of their claim while the FDIC proceeds with the resolution and disposition of the remaining assets.

The FDIC Board of Directors is ultimately responsible for determining the least costly transaction. The board may direct that the winning bid determination be delegated to the appropriate division director. After the board approves the transaction, the FDIC staff notifies the acquirer, all unsuccessful bidders, and the chartering agency. The FDIC then arranges for the successful acquirer to execute the appropriate legal documents before the closure. At that time, the FDIC staff meets with the acquirer to coordinate the mechanics of the closing procedures.

**Closing the Institution**

The final step in the resolution process occurs when the institution is closed, and the assets that the acquirer purchased and the deposits that it assumed are transferred to the acquirer. The chartering authority closes the institution and appoints the FDIC as receiver. The FDIC, as receiver, is then responsible for settling the affairs of the bank or thrift, which includes balancing the accounts of the institution immediately after closing; transferring certain assets and liabilities; and determining the exact amount of payment due the acquirer (the liabilities assumed, less the assets acquired and the premium). The settling of various accounts between the receiver and the acquirer is called "settlement."

---

10. From 1980 through 1994, out of 1,617 failing or failed bank situations handled by the FDIC, 1,188 banks, or 74 percent, resulted in purchase and assumption agreements. Deposit payoffs or insured deposit transfers (IDTs) were used in 296 cases, or 18 percent of the total. Open bank assistance accounted for 133 transactions, or 8 percent of the total.

FDIC Ex. 8